IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| W. ROBERT BAYNES, <br> Plaintiff | ) <br> ) <br> ) | No. 3:09-CV-153 |
| v. | ) <br> ) | Judge Kim R. Gibson |
| GEORGE E. MASON FUNERAL, <br> HOME, INC., ALLEGHENY HEARTLAND <br> CASKET COMPANY, INC., DAVID E. <br> LEHMAN, and KIMBALL SWEATT, <br> Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |

**OPINION and ORDER**

From time immemorial, the funeral, perhaps more than any other ceremony, has stood as a solemn occasion, warranting the utmost respect, dignity, and solace. During this time, friends and family members experience untold grief and suffering, as they say goodbye to their loved ones. Those entrusted to make funeral arrangements bear a special responsibility to treat those aggrieved with truthfulness, accountability, and compassion. Taking advantage of those in mourning, is a violation of that sacred trust, and is simply reprehensible. David E. Lehman, Kimball Sweatt, Allegheny Heartland Casket Company, Inc., and George E. Mason Funeral Home, Inc., in concert, defrauded and deceived W. Robert Baynes, following the tragic death of Trey, his surrogate son. The Defendants' deplorable conduct set into action an unfortunate, yet to a great degree unforeseeable chain of events that compounded the suffering of Mr. Baynes and his family. The Court finds Defendants jointly and severally liable for a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law in the amount of $18,000, and liable for a violation of the Implied Warranty of Merchantability, in the amount of $5,595.

1

This award will not erase Mr. Baynes' prolonged suffering, but hopefully, the healing process can continue, and this matter, like Trey, can be laid to a peaceful rest.

## Jurisdiction

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. Venue is proper within this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## Facts

W. Robert Baynes resides in Acworth, Georgia. George Brown Baynes, III, also known as Trey, was the grandson to Mr. Baynes' sister. Trey was Mr. Baynes' biological great-nephew. From the age of two, Mr. Baynes raised Trey in his home as a surrogate son; Mr. Baynes never formally adopted Trey though the two were very close. Trey had special education needs, and did not complete high school. Trey had no contact with his biological father prior to 2004.

In April of 2005, with Mr. Baynes' support, Trey travelled from Georgia to Pennsylvania to spend some time with his biological father, George, Jr., who recently had made contact with his son. After spending a few months with biological father, Trey told his surrogate father that he would return to Georgia in December to celebrate the holidays at home. Tragically, Trey never made it home for Christmas.

On November 23, 2005, at 10:30 p.m., George Jr. called Mr. Baynes, and informed him that Trey had shot himself in the head, and was in the hospital. With some difficulty—Thanksgiving in 2005 fell on November 24—Mr. Baynes managed to fly to Pittsburgh, and drive a rental car to Conemaugh Hospital in Johnstown. My. Baynes was able to spend the night with

2

Trey in the intensive care unit, before he passed away in the morning. Trey was nineteen-years old.

Mr. Baynes and George Jr. agreed that Trey's remains should be transported back to Georgia for their final resting place. On November 25, 2005, Mr. Baynes visited George E. Mason Funeral Home, and was greeted by David Lehman, the supervising funeral director. Mr. Baynes sought a "top of the line" solid bronze casket, which would be durable, and resist rusting. After viewing a number of caskets, Mr. Baynes selected such a casket. The Plaintiff recalls that the casket selected was solid bronze, and had a placard affixed to it indicating it was "solid bronze." Mr. Baynes requested that a blue interior—blue was Trey's favorite color—be installed in the bronze casket he selected. Mr. Lehman told Mr. Baynes he could install the blue lining.

Mr. Lehman provides a different story. Mr. Lehman testified that he told Mr. Baynes the casket he selected, as shown on the floor, was made out of steel, but could be provided in bronze. Mr. Lehman disputes Mr. Baynes' testimony that a placard was affixed to the casket, indicating it was solid bronze. Mr. Lehman testified that he had every intention of providing Mr. Baynes with a bronze casket, but was unable to locate one from Mr. Kimball Sweatt of Allegheny Heartland Casket Company, Inc. or other local funeral homes.

In February of 2007, following a proceeding before the Pennsylvania Bureau of Consumer Protection, Mr. Lehman admitted that he intentionally sold Mr. Baynes a steel casket, and thought the fraud would go undetected. The Court finds that Mr. Lehman's testimony at the nonjury trial is not credible. Further, the Court finds that Mr. Sweatt's story is riddled with prevarications, inconsistencies, and contradictions, and is not to be credited. Working in concert with Mr. Sweatt, Mr. Lehman decided to provide Mr. Baynes with a steel casket, lined with the blue interior, even though Mr. Baynes thought he was purchasing a bronze casket. Mr. Lehman

testified that only he, and Mr. Sweatt knew about this ruse, and did not tell anyone else at George E. Mason Funeral Home.

Mr. Baynes entered into a contract to purchase what he thought was a solid bronze casket, and have it transported back to Georgia with Trey's embalmed remains. The total price was $7,924.00. Mr. Baynes did not tell Mr. Lehman that he intended to inter the casket in a stone mausoleum. Mr. Baynes left Pennsylvania to return to Georgia, under the impression that Trey's remains were in a solid bronze casket.

The casket containing Trey's remains, bearing a "solid bronze" placard, arrived in the Peach State on Saturday, November 26, 2005. Ricky Bennett, funeral director of the Winkenhofer Funeral Home picked it up at the airport, and prepared Trey's remains for a private viewing on Sunday, November 27, 2005, and a funeral on Monday, November 28, 2005.

Following the funeral, Mr. Baynes, and his wife, decided they would construct a three-crypt mausoleum, that consisted of a top crypt, perched above two bottom crypts. Trey would be interred in the top crypt, and Mr. Baynes and his wife planned on being interred in the bottom two crypts. In the interim, Mr. Baynes contracted Marci Haber, of Grady Norton Memorial, to construct the mausoleum in December of 2005. According to the Plaintiff, the cost of the granite mausoleum was $36,000, though Plaintiff provided no evidence documenting this price.

Mr. Baynes, or a representative at the Winkenhofer Funeral Home, provided Ms. Haber with the dimensions of the original casket purchased at the George E. Mason Funeral Home. While the permanent mausoleum was being construed, the casket containing Trey's remains was stored in a temporary, display mausoleum, placed at Grady Norton Memorial's facility. This temporary mausoleum was sold in August of 2006. At that time, Trey's casket was moved to another temporary mausoleum, placed in the Baynes' family plot at the Eastview Cemetery.

Mr. Baynes scheduled a committal memorial service for the entire family at the cemetery on Sunday, September 3, 2006. On Saturday, September 2, 2006, Rickey Bennett, funeral director of the Winkenhofer Funeral Home called Mr. Baynes with some tragic news, and told him that the casket containing Trey's remains had "failed." Baynes witnessed a sight that was an affront to the most fundamental dignity of human nature; the casket was deteriorating, corroding, rusting, and leaking a blue fluid. The casket also emitted a horrendous odor. Mr. Baynes learned that the bronze casket he had purchased was in fact made of steel.

With the committal memorial service less than twenty-four hours away, Mr. Baynes was placed in a tragic, and unfortunate situation. With so little time to act, Mr. Baynes had few, if any options. Ms. Haber located a single solid bronze casket at the Batesville Casket Company, but did not check to verify the dimensions, and ascertain whether it would fit in the permanent mausoleum. Ms. Haber called Mr. Lehman, and threatened to sue the Mason Funeral Home if they did not purchase the replacement casket. Mr. Bennett purchased the only solid bronze casket in stock at the Batesville Casket Company for $5,940. The Mason Funeral Home eventually reimbursed the Winkenhofer Funeral Home for buying the replacement casket. At no point did Ms. Haber, Mr. Bennet, or Mr. Baynes tell Mr. Lehman that a custom mausoleum was being constructed. Mr. Lehman, who learned of the defective casket from Ms. Haber and Mr. Bennett, asked to have the casket returned. Mr. Sweatt also asked to have the casket returned.

Mr. Bennett drove with Mr. Baynes to obtain the replacement casket. Mr. Bennett did not measure the casket. Upon their return, Mr. Baynes asked Mr. Bennett if he could see Trey's remains. Mr. Bennett responded, "You do not want to do that." Trey's remains were transferred to the replacement casket. When the replacement casket was placed in the temporary mausoleum, Ms. Haber noticed that the handles of the casket were scraping the sides of the

edifice. The handles on the casket purchased from the Mason funeral home were recessed, but the handles on the casket purchased from Batesville were "swing handles."

On November 15, 2006, two months after the committal ceremony, Ms. Haber emailed Mr. Baynes, and notified him that the replacement casket would not fit in the custom mausoleum, as designed. It was too wide, and would not fit. Ms. Haber presented Mr. Baynes with two options: first, to start over, and redesign the permanent mausoleum; second, to reduce the thickness of the walls from 6 inches to 4 inches. For some reason, Ms. Haber did not present the seemingly apparent third option—transfer Trey's remains to a new casket that would fit the design. A fourth option—remove the "Swing handles" from the casket—may also have reduced the size of the casket, allowing it to fit into the custom mausoleum. Mr. Baynes, cognizant that reducing the width of the walls could weaken the structure, opted for the second option. The re-design of the mausoleum cost $9,875, a debt that remains outstanding.

The second casket, containing Trey's remains, was interred in the custom mausoleum upon its completion in May of 2008. Shortly thereafter, Mr. Baynes noticed that end walls on the top section of the mausoleum—the very walls he decided to have reduced in width and thereby weakened—were cracked and crumbling. Photographic evidence of the cracks is somewhat inconclusive as to the extent of the damage. Mr. Baynes installed a four-inch piece of granite to conceal the cracks, though this remedial measure does not fix the structural defects. Plaintiff claims that there is no way to repair the mausoleum, and it must be replaced, at an estimated cost of $100,970.

## Analysis

### I. Count I – Pennsylvania Unfair Trade Practices and Consumer Protection Law

Count I of the Complaint alleges a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S.A. § 201 et seq (UTPCPL). The UTPCPL grants a private right of action to consumers harmed by deceptive business practices. 73 Pa.C.S.A. §201-9.2(a). Under the statute:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful [by] this act, may bring a private action to recover actual damages. *Id.*

In order to maintain a private right of action under the UTPCPL, a plaintiff must show that he 1) purchased or leased goods or services primarily for a personal, family, or household purpose; 2) suffered an ascertainable loss of money or property; and 3) the loss occurred as a result of the use or employment by a person of a method, act, or practice declared unlawful by the UTPCPL. 73 P.S. § 201-9.2(a). The plaintiff must offer evidence of one of the statutorily delineated "unfair methods of competition" found at 73 P.S. § 201-2(4), or evidence which fits the "catch-all provision" found at 73 P.S. § 201-2(4)(xxi).

The purpose of the UTPCPL is to protect the public from and eradicate "unfair and deceptive business practices." *Commonwealth v. Monumental Properties*, 329 A.2d 812, 815-17 (Pa. 1974). The statute's "underlying foundation is fraud prevention," and its strategy is to place the consumer and the seller of goods and services on more equal terms. *Id.* at 816. To effect the remedial goals of the legislation, courts should construe its provisions liberally. *Id.* at 816-17; accord *Ash v. Continental Ins. Co.*, 932 A.2d 877, 881 (Pa. 2007).

7

At trial, Mr. Baynes alleged three violations of the UTPCPL: (1) that defendants engaged in an unfair or deceptive act by placing a placard on a casket representing that it was bronze when in fact it was steel, in violation of 73 Pa.C.S.A. § 201-2(4)(v); (2) that defendants engaged in an unfair or deceptive act by representing to Mr. Baynes that Trey's remains would be stored in a high quality solid bronze casket when in fact his remains were placed in an inferior steel casket that deteriorated, rusted, and leaked, in violation of 73 Pa.C.S.A. § 201-2(4)(vii); and (3) under the "catch all provision," that defendants sold Mr. Baynes a casket by fraudulent or deceptive conduct that created confusion and misunderstanding, in violation of 73 Pa.C.S.A. § 201-2(4)(xxi).

The elements of a claim for fraud must be proved by "evidence that is clear, precise and convincing." *Snell v. Pennsylvania*, 416 A.2d 468, 470 (Pa. 1980); *Beardshall v. Minuteman Press International, Inc.*, 664 F.2d 23, 26 (3d Cir. 1981) (rejecting a "preponderance of the evidence" standard for Pennsylvania fraud claims). Defendant Mason Funeral Home claims that Mr. Lehman did not intentionally engage in fraudulent conduct in connection with selling the casket; specifically, Mr. Lehman had every intention of providing Mr. Baynes with a bronze casket, rather than defrauding him. This explanation is fanciful.

Mr. Baynes selected a casket with a placard indicating it was solid bronze. Mr. Baynes told Mr. Lehman he wanted a high quality casket that was solid bronze. Mr. Lehman, in concert with Mr. Sweatt, knowingly and intentionally gave Mr. Baynes a defective steel casket, while representing it to be solid bronze. This intentional, fraudulent scheme is reprehensible, and took advantage of a grieving father at a most vulnerable time. Purporting to sell a solid bronze casket that is actually a defective steel casket is the perfect racket—once it is buried in the ground, no

one will ever know about it. Were it not for Mr. Baynes' decision to delay the interment of the casket, this fraud would likely have never been detected.

The Court finds that Plaintiff has shown that he (1) purchased a casket for familial purposes; (2) suffered an ascertainable loss of money in property, as the casket was defective; and (3) the loss occurred as a result of the fraudulent and deceptive conduct of Mr. Lehman, Mr. Sweatt, and George E. Mason Funeral Home. 73 P.S. § 201-9.2(a). Defendants are liable for a violation of UTPCPL. That much is relatively straightforward, and Defendants effectively concede this point. The gravamen of this opinion is the scope of foreseeable damages recoverable under the UTPCPL.

## II.     Foreseeable and Proximate Damages Under UTPCPL

Mr. Baynes seeks to recover the cost of tearing down the existing custom mausoleum and building a new custom mausoleum. Although the cost of the custom mausoleum was approximately $35,000 to $40,000, Mr. Baynes seeks to recover $100,970.00, which is the estimated cost quoted by a third party memorial company to tear down the entire existing mausoleum (and its foundation), and replace it with an entirely new custom mausoleum.

Defendants assert that these damages were neither proximately caused by nor reasonably foreseeable, and therefore cannot be recovered. Plaintiff counters that the construction of a custom mausoleum was foreseeable. Plaintiff claims that there were only two possible dispositions of the casket containing the remains of Trey when the casket arrived in Georgia: burial or interment in a mausoleum. Plaintiff claims that Mr. Lehman, as a licensed funeral director, was responsible for knowing, and was in fact familiar with state regulations governing conduct of funeral directors. 49 Pa. Code § 13.181. Accordingly, Plaintiff asserts that Mr. Lehman knew or should have known that a consumer may choose to bury a casket purchased

9

from Mason Funeral Home, or may choose to inter the casket in an above-ground mausoleum. 49 Pa. Code § 13.184, 13.201(6)(ii) (entombing); 28 Pa. Code § 1.22(b). Further, Plaintiff claims that Mason Funeral Home should reasonably have expected either alternative, and the consequences that would arise if the replacement casket did not fit the existing mausoleum.

The doctrine of foreseeability and consequential damages finds an esteemed lineage in our cases, stemming from the canonical common law case of *Hadley v. Baxendale* from the Court of Exchequer Chamber.[1] "Pennsylvania law distinguishes between general damages— those ordinary damages that flow directly from the breach; and special or consequential damages—those collateral losses, such as expenses incurred or gains prevented which result from the breach." *LBL Skysystems (USA), Inc. v. APG-America, Inc.*, 319 F.Supp.2d 515, 523 (E.D. Pa. 2004) (citations omitted).

Damages under the UTPCPL must be incurred "as a result of" the defendant's conduct in violation of the Act. 73 Pa.C.S.A. §201-9.2(a). Like damages recoverable under the U.C.C., the damages recoverable under the UTPCPL must be 1) reasonably foreseeable to the defendant at the time of the transaction, and 2) proximately caused by the defendant's actions. *AM/PM Franchise Ass'n. v. Atlantic Richfield Co.*, 584 A.2d 915, 921 (Pa. 1990) (damages under the U.C.C. for breach of warranty must be "reasonably foreseeable at the time the agreement was entered into.") The key to this case is whether the damages to the mausoleum were foreseeable to Defendants at the time the original casket was sold, and whether the damages to the mausoleum were proximately caused by the defendant's fraudulent sale of the defective casket. The Court

---

[1] 9 Exch. 341 (1854) ("Now we think the proper rule in such a case as the present is this: Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it.").

10

finds that the damages claimed for the mausoleum were not foreseeable, and not proximately caused by Defendants.

In analyzing foreseeability, contracting parties are not held or assumed "to know the condition of each other's affairs, nor to take into consideration any existing or contemplated transactions not communicated or known, with other persons." *LBL Skysystems*, 319 F.Supp.2d at 524 (citations omitted). Damages must be both foreseeable at the time that the contract was entered into, and proximately caused by the defendant's conduct.

The facts suggest that the damages to the mausoleum, and the resulting repair costs, were not foreseeable. Mr. Baynes did not tell Mr. Lehman or anyone else at Mason Funeral Home that he was building a mausoleum. He only made the decision to do so after he returned to Georgia. Even after Mr. Baynes discovered the problems with the first casket, neither Mr. Baynes nor Ms. Haber told Defendants that Trey's remains were to be interred in a mausoleum, and the replacement casket needed to be a certain dimension. Defendants were not on notice that any replacement casket had to be a certain size. Defendants were never informed that Ms. Haber reduced the thickness of the walls of the top crypt in order to fit the second casket, which was larger than the first casket. Mr. Baynes' decision to modify the custom mausoleum by reducing the thickness of the walls, which led to the structural cracking and crumbling, was not foreseeable by Defendants at the time the original casket was purchased. Additionally, it was not foreseeable to Defendants that Mr. Baynes would not simply purchase a third casket that would have fit the mausoleum, at a much lower cost. These damages were not proximately caused by the sale of the defective casket.

Additionally, Mr. Baynes failed to take certain steps that could have mitigated the damages. "As a matter of general contract law, the Pennsylvania Supreme Court has held that a

11

plaintiff's duty to mitigate its damages arises upon the defendant's breach of the contract." *Koppers Company, Inc. v. Aetna Casualty & Surety Co.*, 98 F.3d 1440, 1448 (3rd Cir. 1996). Mr. Baynes conceded that he could have purchased a third casket that would have fit in the mausoleum, but made no effort to do so. Mr. Baynes could even have asked Mason Funeral Home to pay for a third casket, as he had previously demanded they pay for a second casket. The Court takes into account that perhaps Mr. Baynes did not wish to transfer Trey's remains to a third casket another time to avoid any further indignity. The Court also takes into account that perhaps Mr. Baynes did not wish to remove the "swing handles" from the second casket, even though that could have allowed it to fit, as it would impair the aesthetics of the casket, or make it more difficult to carry. The Court also notes that the granite covers installed to conceal the cracking and crumbling appear to be effective. The need to build a new mausoleum, at a prohibitive cost, was not proven to the Court.

These are all steps Mr. Baynes could have taken to mitigate damages. While the Court does not fault Mr. Baynes for his initial purchase of the replacement casket without verifying the size in light of his grief-stricken situation, almost 21-months elapsed between the discovery of the problem in September of 2006 and the completion of the mausoleum in May of 2008. That time provided Mr. Baynes with a sufficient period in which he could have obtained a third replacement casket that was compatible with the mausoleum dimensions. The subsequent choice to reduce the thickness of the walls, and not obtain a third casket, made almost two months after the committal ceremony, is found to be not reasonable.

Further, the decision to reduce the thickness of the granite walls was not reasonable, as even Mr. Baynes conceded that thinner walls could reasonably be expected to reduce the strength of the structure. Ms. Haber, whose experience in building these mausoleums was somewhat

limited at that time—she had only constructed between four and six mausoleums at that time—should have known that thinner walls could reasonably be expected to result in a weak structural integrity. Ms. Haber's inattention to this detail constitutes a superseding cause of any damages.

The Court finds the damages were neither foreseeable, nor proximate. The resulting sequence of events, starting in the George E. Mason Funeral Home and ending on the Baynes Family Plot in Georgia, was attenuated and unpredictable. As repugnant as the actions of Defendants were, the Court cannot hold them liable for damages they could not reasonably have foreseen, and for which they were not responsible. The price of constructing a new mausoleum—which would cost three times as much as the original mausoleum—is not recoverable under the UTPCPL.

Mr. Baynes did not incur any out-of-pocket costs in connection with the replacement casket, which was ultimately paid for by Mason Funeral Home. The damages the Plaintiff can recover are limited by the cost of a third casket—a casket that reasonably should have been purchased, but was not. The Court finds that the reasonable cost of the third casket was $6,000. The Court limits any recoverable damages to the cost of a third casket, at a cost of $6,000.

In *Schwartz v. Rockey*, 932 A.2d 885 (Pa. 2007), the Supreme Court of Pennsylvania held that a trial court's discretion to award treble damages under the UTPCPL should be guided by the "presence of intentional or reckless, wrongful conduct, as to which an award of treble damages would be consistent with and in furtherance of, the remedial purposes of the UTPCPL." *Id.* at 898. This standard is lower than the common-law standard for punitive damages. *Id.* The Court finds treble damages warranted in this case. The behavior of Defendants was "intentional, reckless, wrongful," and an award of treble damages is "consistent with and in furtherance of, the

remedial purposes of the UTPCPL." Trebling the amount of $6,000 yields a total award of $18,000 under the UTPCPL.

### III. Count II - Common Law Breach of Implied Warranty of Merchantability and

Count II of the Complaint alleges a claim for breach of implied warranty of merchantability under the Pennsylvania Uniform Commercial Code, 13 Pa.C.S.A. § 1101 et seq. (the "U.C.C."). Section 2314(a) of the U.C.C. provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 13 Pa.C.S.A. § 2314(a).

Section 2314(b) provides:

> (b) Merchantability standards for goods.--Goods to be merchantable must be at least such as:
> (1) pass without objection in the trade under the contract description;
> (2) in the case of fungible goods, are of fair average quality within the description;
> (3) are fit for the ordinary purposes for which such goods are used;
> (4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;
> (5) are adequately contained, packaged, and labeled as the agreement may require; and
> (6) conform to the promises or affirmations of fact made on the container or label if any.

Defendant Mason Funeral Home concedes that the original casket did not "conform to the promises or affirmations of fact made on the container" because it was not a solid bronze casket. However, the only damages sought by Mr. Baynes that are recoverable are those that are proximately caused by the fact that the original casket was steel, rather than bronze.

The court finds that the original casket purchased at the Mason Funeral Home violated the implied warranty of merchantability, and defendants are liable for the breach. As demonstrated in the previous section, the damages associated with the mausoleum were not foreseeable, and thus cannot be recovered under the U.C.C. Accordingly, damages are limited to what Mr. Baynes was charged for the original casket.

14

13 Pa.C.S. § 2714(b) provides:

> (b) MEASURE OF DAMAGES FOR BREACH OF WARRANTY. –The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

The value of the solid bronze casket, had it been as warranted would have been $5,595.00. The value of the defective steel casket, was effectively $0. Thus, the difference between the two values is the total cost of the casket—$5,595.00 Under the UCC, Mr. Baynes is entitled to the amount he was charged for the original casket, $5,595.00.

## IV.   Counts III - Common Law Breach of Contract

Count III of the Complaint alleges a claim for breach of contract under Pennsylvania common law. Count III is duplicative of Count II, and seeks redress for the same harm. Count III offers no additional allegations, and simply incorporates facts from the previous causes of action. Under Pennsylvania law, a contract can be governed by either the common law or the U.C.C., but not both. *See, e.g, DeFilippo v. Ford Motor Co.*, 561 F.2d 1313, 1323 (3rd Cir. 1975) (rejecting the application of the U.C.C. to the "goods" and the common law to the balance of the contract). Plaintiff cannot recover simultaneously under Counts II and III. Because the Court has decided that "the U.C.C., and not the common law, is the applicable body of law to apply," Memorandum Opinion and Order on Mason Funeral Home's summary judgment motion, p. 6 (Doc. No. 77), to the Funeral Services Contract, Defendants are entitled to judgment on Mr. Baynes' claim for common law breach of contract (Count III).

## V. Damages

Defendant Mason Funeral Home seeks indemnification from Mr. Sweatt and Allegheny Heartland. Though Mr. Sweatt, and his now-defunct corporation, may have been the brains behind this unsavory operation, Mr. Lehman, agent of Defendant Mason Funeral Home, was complicit and voluntarily engaged in this fraudulent activity. The Court finds that all defendants are jointly and severally liable for all damages.

## ORDER

AND NOW, this 2nd day of June, 2011, in accordance with the forgoing Opinion, it is hereby **ORDERED** that the Court finds that all Defendants are jointly and severally liable to Plaintiff for $18,000.00 of damages under the UTPCPL, and $5,595.00 under the U.C.C.; and it is further **ORDERED** that the Court finds for the Defendants against the Plaintiff on the cause of action for common law breach of contract. Accordingly, it is **ORDERED** that judgment be entered in favor of Plaintiff and against all Defendants, jointly and severally, on the UTPCPL claim in the amount of $18,000.00 and on the U.C.C. claim in the amount of $5,595.00; and that judgment be entered in favor of all Defendants and against Plaintiff on the common law breach of contract claim.

BY THE COURT:

**KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE**